IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLEAN HARBORS, INC., a Massachusetts )
corporation; and CLEAN HARBORS )
COFFEYVILLE, LLC, a Delaware limited )
liability company, )
)
                 Plaintiffs, )
) Case No. 10-CV-2017 KHV/JPO
v. )
)
CBS CORPORATION, a Delaware corporation, )
)
                 Defendant. )

## COMPLAINT

Plaintiffs Clean Harbors, Inc. and Clean Harbors Coffeyville, LLC (collectively, "Clean Harbors"), by and through their attorneys of record, and for their Complaint against Defendant CBS Corporation ("CBS"), state as follows:

**I.   PARTIES**

1. Clean Harbors, Inc. is a Massachusetts corporation with its principal place of business in Massachusetts.

2. Clean Harbors Coffeyville, LLC is a limited liability company organized under the laws of Delaware. Clean Harbors Coffeyville, LLC's principal place of business is in Norwell, Massachusetts. Clean Harbors Coffeyville, LLC is registered to do business in Kansas and is in good standing and owns a facility in Coffeyville, Kansas. Clean Harbors Coffeyville, LLC is a wholly-owned subsidiary of Clean Harbors, Inc.

3. Upon information and belief, CBS is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. CBS was formerly known as Viacom, Inc. ("Viacom") as Viacom changed its legal name to CBS Corporation on or

about December 31, 2005. CBS is a successor in interest to Westinghouse Electric Corporation ("Westinghouse").

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and pursuant to the rules of ancillary and pendent jurisdiction.

5. Venue is proper in this district under 28 U.S.C. § 1391(b) because the property that is the subject of this action is located in Coffeyville, Kansas and CBS's wrongful acts and/or omissions giving rise to Clean Harbors' claims took place in Coffeyville, Kansas.

## III. FACTS COMMON TO ALL COUNTS

6. Clean Harbors owns a facility located at 169 N. Industrial Park, Rt. 3 in Coffeyville, Kansas ("Facility"). The Facility is approximately four miles north of Coffeyville, Kansas on approximately 406 acres at the southern end of the Coffeyville Industrial Park.

7. Prior to Clean Harbors' ownership of the Facility, the waste management, treatment and disposal activities by CBS and its predecessors in interest, including but not limited to Aptus, Inc. ("Aptus"), Westinghouse and National Electric, Inc. ("NEI"), at the Facility caused the Facility to become contaminated with hazardous waste substances and hazardous waste constituents.

8. Upon information and belief, the actions of CBS and its predecessors in interest, including but not limited to Aptus, Westinghouse and NEI, caused the Facility to be contaminated with, but not limited to, the following hazardous substances and hazardous waste constituents:

   a. <u>1,1-Dichloroethene.</u> 1,1-dichloroethene, also known as vinylidene chloride and 1,1-DCE among other synonyms and trade names, is an industrial chemical that is not found naturally in the environment. This chemical is used to make certain plastics and packaging materials, as well as flame retardant coatings and adhesive applications. Breathing

2

high levels of this chemical can affect the liver, kidneys and central nervous system and has been found to be a possible human carcinogen.

    b. <u>Tetrachloroethene.</u> Tetrachloroethene, also known as Tetrachloroethylene and PCE among other synonyms and trade names, is a manufactured chemical primarily used for dry cleaning fabrics and for metal degreasing, as well as to make other chemicals. Exposure to high concentrations of this chemical can cause dizziness, headaches, sleepiness, confusion, nausea, difficulty in speaking and walking. The Department of Health and Human Services has determined this chemical may be reasonably anticipated to be a carcinogen.

    c. <u>Trichloroethene.</u> Trichloroethene, also known as Trichloroethylene among other synonyms and trade names, is a chemical not generally thought to occur naturally in the environment. Trichloroethene is primarily used as a solvent or degreaser, but can also be used in adhesives, paint removers and spot removers. Drinking or breathing high levels of this chemical can affect the nervous system, liver and lung function, cause an abnormal heartbeat, and it is generally believed to be a possible human carcinogen.

    d. <u>Arsenic.</u> Arsenic is a naturally occurring element which, when combined with oxygen, chlorine or sulfur can form inorganic arsenic compounds. Such compounds are primarily used to preserve wood where organic arsenic compounds are mainly used in pesticides. Exposure to high levels of arsenic can cause discoloration of the skin, certain skin conditions and sometimes death. Inhaled or ingested arsenic can injure pregnant women and their unborn babies and arsenic has been considered to be a human carcinogen.

    e. <u>Chromium.</u> Chromium is a naturally occurring element which can take various forms for its use in industry. $Chromium^{+3}$ and $Chromium^{+6}$ are primarily used for chrome plating, dyes and pigments, leather tanning and wood preserving. Inhaling high levels of $chromium^{+6}$ can damage the nose; ingesting high levels of $chromium^{+6}$ can result in anemia or damage to the digestive system. $Chromium^{+6}$ compounds are known human carcinogens.

    f. <u>Benzene.</u> Benzene, also known by other synonyms and trade names, is a widely used chemical which can be formed by natural and manufactured sources. Some industrial uses are to make other chemicals that make plastics, resins and nylon and other synthetic fibers, as well as being used to make lubricants, dyes, detergents and pesticides. Benzene is also a part of crude oil and gasoline. Breathing benzene can cause drowsiness, dizziness and unconsciousness where long-term exposure affects the bone marrow and can cause anemia and leukemia. Benzene is a known human carcinogen.

    g. <u>Carbon tetrachloride.</u> Carbon tetrachloride, also known by other synonyms and trade names, is a manufactured chemical that does not occur naturally in the environment. Carbon tetrachloride is most often used in the production of refrigeration fluid and propellants for aerosol cans, as a pesticide, cleaning fluid and degreasing agent, in fire extinguishers and as a spot remover. Exposure to high levels of this chemical can cause damage to the liver, kidneys and nervous system and is considered to be a probable human carcinogen.

    h. <u>Chlorobenzene.</u> Chlorobenzene, also known as MCB and other synonyms and trade names, is a manufactured chemical that does not occur naturally in the environment.

3

Its historical use was to make other chemicals such as phenol and DDT, but chlorobenzene is now primarily used as a solvent for some pesticide formulations, as a degreasing agent and as a chemical intermediate to make several other chemicals. High levels of exposure to this chemical can damage the liver and kidneys and affect brain function.

    i. <u>Chloroform.</u> Chloroform is also known as trichloromethane and other synonyms and trade names. Chloroform is generally used to make other chemicals. Inhaling chloroform can cause dizziness, fatigue and headaches and ingesting chloroform over long periods can affect the liver and kidneys. Skin contact with this chemical can create skin legions. Chloroform has been determined by the Department of Health and Human Services to be reasonably anticipated to be a carcinogen.

    j. <u>1,2-Dichloroethane.</u> 1,2-dichloroethane, also known as ethylene dichloride among other synonyms and trade names, is a manufactured chemical that is not found naturally in the environment. A common use of 1,2-dichloroethane is the production of vinyl chloride which is used to make a variety of plastic and vinyl products as well as used as a solvent and a gasoline additive. Breathing or ingesting high levels of this chemical can cause damage to the nervous system, liver, kidneys and lungs and may cause cancer.

    k. <u>1,2-Dichloroethene.</u> 1,2-dichloroethene, also known as 1,2-dichloroethylene as well as by its isomers cis- and trans-, is a chemical used to produce solvents and is used in chemical mixtures. Inhalation of high levels of 1,2-dichloroethene can cause nausea and drowsiness with very high levels causing death.

    l. <u>Methylene chloride.</u> Methylene chloride, also known as dichloromethane among other synonyms and trade names, is a chemical which does not occur naturally in the environment. Methylene chloride is primarily used as an industrial solvent and as a paint stripper, but it can also be found in some aerosol and pesticide products as well as being used in the manufacture of photographic film. Inhaling large amounts of methylene chloride can damage the central nervous system, contact with skin or eyes can result in severe irritation and burns. Methylene chloride has been determined to be a probable cancer-causing agent in humans.

    m. <u>Vinyl chloride.</u> Vinyl chloride, also known as VC, chloroethene and chloroethylene among other synonyms and trade names, is a manufactured chemical that does not occur naturally in the environment. Vinyl chloride is a also a chemical that can be formed from the breakdown of substances such as trichloroethane, trichloroethylene and tetrachloroethylene. Vinyl chloride is used in the production of polyvinyl chloride (PVC) which is used in the manufacture of plastic products, pipes, wire and cable coatings and packaging materials. Inhalation of vinyl chloride can cause dizziness, sleepiness, unconsciousness or, at very high levels, death. Long periods of inhalation of this chemical can affect the liver, immune system, and cause nerve damage. Vinyl chloride has been determined to be a known carcinogen.

    9. The Facility was the subject of a Consent Order of the United States Environmental Protection Agency ("EPA"), dated August 30, 1988. (See Consent Order, EPA Docket No. 88-H-0030.)

10. Safety-Kleen (Aragonite), Inc. ("Safety-Kleen") had acquired the Facility from Westinghouse pursuant to a Stock Purchase Agreement, dated March 7, 1995, between, among others, Westinghouse and Rollins Environmental Services, Inc. ("Rollins"), the predecessor to Safety-Kleen (Aragonite).

11. Although Westinghouse transferred ownership of the Facility to Rollins, the predecessor to Safety-Kleen, Westinghouse and its successors in interest (CBS and Viacom) retained the obligation to continue and complete the cleanup of the Facility until cleanup levels are to the satisfaction of EPA and maintained for one year thereafter. Accordingly, after Safety-Kleen acquired the Facility, Westinghouse continued to investigate and remediate the contamination at the Facility.

12. Westinghouse later became known as CBS and CBS later became known as Viacom. Viacom later changed its legal name to CBS Corporation. Viacom and CBS continued to investigate and remediate the contamination at the Facility for a period of time.

13. In 2002, Clean Harbors purchased the Facility from Safety-Kleen as part of the sale of certain assets of Safety-Kleen during its bankruptcy proceedings. In connection with the purchase of the Facility from Safety-Kleen, Safety-Kleen assigned to Clean Harbors its indemnification rights and claims under Article 12 of the Stock Purchase Agreement through the Assignment of Indemnification Rights and Claims ("Assignment"). A true and correct copy of the Assignment is attached hereto as Exhibit "A."

14. After Clean Harbors purchased the Facility, Viacom and CBS continued to perform remediation and monitoring work evidencing their continued indemnification obligations to Clean Harbors. CBS thereafter ceased monitoring and remediation at the Facility despite demands by Clean Harbors.

3784702v1

15. Accordingly, the Facility remains significantly contaminated. The contamination presents an imminent and substantial endangerment to human health and the environment and has caused and will continue to cause significant damage to Clean Harbors.

## COUNT I – VIOLATION OF THE RESOURCE CONSERVATION AND RECOVERY ACT

16. Clean Harbors incorporates by reference all of the allegations set forth above.

17. Clean Harbors brings this cause of action under section 7002(a)(1)(B) of RCRA and 42 U.S.C. § 6972 (a)(1)(B).

18. The waste management, treatment and disposal activities by CBS and its predecessors in interest, including but not limited to Aptus, Westinghouse and NEI, at the Facility caused the Facility to become significantly contaminated with hazardous waste substances and hazardous waste constituents. The contamination presents an imminent and substantial endangerment to human health and the environment.

19. Clean Harbors has complied with the notice provision of section 7002(b)(2)(A) of RCRA and 28 U.S.C. § 6972(b)(2)(A).

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count I and order CBS to complete the cleanup of the Facility and award Clean Harbors its attorneys' fees and costs in connection with this citizen suit, as allowable by law, and any other relief the Court deems fair and just.

## COUNT II – DECLARATORY JUDGMENT

20. Clean Harbors incorporates by reference all of the allegations set forth above.

21. A case and controversy currently exists between Clean Harbors and CBS regarding CBS's responsibility to investigate and remediate the contamination at the Facility.

3784702v1

Clean Harbors requests the Court declare that CBS has the responsibility to complete the investigation and cleanup of the contamination at the Facility.

WHEREFORE, Clean Harbors requests the Court grant it judgment under Count II against CBS and declare that CBS has the responsibility to continue and complete the investigation and cleanup of the contamination at the Facility.

## COUNT III – NEGLIGENCE

22. Clean Harbors incorporates by reference all of the allegations set forth above.

23. CBS has the duty to investigate and remediate the contamination at the Facility. CBS breached that duty by failing to investigate and clean up the contamination.

24. As the corporate successor of the entities that contaminated the property, CBS has the duty to continue and complete the investigation and cleanup of the Facility.

25. The Facility remains significantly contaminated because of CBS's failure to comply with its responsibilities. Clean Harbors has suffered and will continue to suffer damages because of CBS's breach of its duties.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count III and award it damages in an amount to be proven at trial, but in excess of $75,000, plus costs of this action, attorneys' fees if and as allowed by law, and any other relief the Court deems fair and just.

## COUNT IV – TRESPASS

26. Clean Harbors incorporates by reference all of the allegations set forth above.

27. The waste management, treatment and disposal activities by CBS and its predecessors in interest, including but not limited to Aptus, Westinghouse and NEI, at the Facility caused the Facility to become significantly contaminated with hazardous waste

7

substances and hazardous waste constituents. The hazardous waste substances and hazardous waste constituents remain on the Facility and have contaminated groundwater, which is migrating off-site.

28. Aptus and its successors in interest (Westinghouse, Viacom and CBS) investigated and began remediation of the contamination at the Facility for a period of time. CBS has decided to stop fulfilling its responsibility to monitor and clean up the contamination.

29. Contamination for which CBS is responsible remains on Clean Harbors' property and is migrating off the property, yet CBS has quit cleaning up the contamination.

30. Clean Harbors, including its predecessors, has never given CBS, or any of its predecessors, permission to leave its contamination at the Facility.

31. Clean Harbors has suffered and will continue to suffer damages due to the contamination still present at the Facility as a result of CBS's and its predecessors' contamination at the Facility and subsequent refusal to investigate and remediate the contamination.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count IV and award it damages in an amount to be proven at trial, but in excess of $75,000, plus costs of this action, attorneys' fees if and as allowed by law, and any other relief the Court deems fair and just.

## COUNT V – NUISANCE

32. Clean Harbors incorporates by reference all of the allegations set forth above.

33. The waste management, treatment and disposal activities by CBS and its predecessors in interest, including but not limited to Aptus, Westinghouse and NEI, at the

8

3784702v1

Facility caused the Facility to become significantly contaminated with hazardous waste substances and hazardous waste constituents.

34. Aptus and its successors in interest (Westinghouse, Viacom and CBS) investigated and started remediation of the contamination at the Facility for a period of time. However, CBS ceased fulfilling its responsibility to clean up the contamination.

35. Contamination for which CBS is responsible remains on Clean Harbors' property and CBS refuses to complete the cleanup of the contamination.

36. These actions by CBS and its predecessors in interest have unreasonably interfered with Clean Harbors' property rights at the Facility and have unreasonably obstructed Clean Harbors' reasonable and comfortable use and enjoyment of the Facility.

37. The unreasonable actions taken by CBS and its predecessors in interest have harmed and damaged and will continue to harm and damage Clean Harbors.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count V and award it damages in an amount to be proven at trial, but in excess of $75,000, plus costs of this action, attorneys' fees if and as allowed by law, and any other relief the Court deems fair and just.

## COUNT VI – STRICT LIABILITY

38. Clean Harbors incorporates by reference all of the allegations set forth above.

39. The waste management, treatment and disposal activities by CBS and its predecessors in interest, including but not limited to Aptus, Westinghouse and NEI, at the Facility caused the Facility to become significantly contaminated with hazardous waste substances and hazardous waste constituents. The Facility remains contaminated.

9

40. As explained in detail in Paragraph 8 above, the chemicals at the Facility are hazardous and pose a significant risk to land and persons. Specifically, Clean Harbors is prohibited from doing anything subsurface in the area surrounding the Facility and is prohibited from building in the area. In addition, there is a prohibition on pumping by neighbors because subsurface activities such as pumping will accelerate the movement of the contamination.

41. The chemicals have migrated off-site and threaten the land and health of others.

42. The chemicals contaminating the Facility do not hold any value for the community.

43. Therefore, CBS is strictly liable for the damage caused by the contamination of the Facility.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count VI and award it damages in an amount to be proven at trial, but in excess of $75,000, plus costs of this action, attorneys' fees if and as allowed by law, and any other relief the Court deems fair and just.

## COUNT VII – UNJUST ENRICHMENT

44. Clean Harbors incorporates by reference all of the allegations set forth above.

45. CBS has tried to take unfair advantage of Safety-Kleen's bankruptcy proceedings by notifying Clean Harbors through the proceedings that it will not complete the cleanup of the contamination of the Facility. CBS knows that it has the obligation to continue and complete cleaning up the contamination of the Facility.

46. Notwithstanding its knowledge, CBS has quit cleaning up the Facility. Because of CBS's wrongful actions, Clean Harbors has no choice but to finish the cleanup of the Facility.

3784702v1

47. It is inequitable for CBS to benefit because of its wrongdoing and CBS has the obligation to continue and complete the cleanup of the Facility.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count VII and order CBS to continue and complete the investigation and cleanup of the contamination at the Facility.

## COUNT VIII – INDEMNIFICATION

48. Clean Harbors incorporates by reference all of the allegations set forth above.

49. In connection with the purchase of the Facility from Safety-Kleen, Safety-Kleen assigned to Clean Harbors its indemnification rights and claims under Article 12 of the Stock Purchase Agreement through the Assignment.

50. After Clean Harbors purchased the Facility, Viacom and CBS continued to perform remediation and monitoring work evidencing their continued indemnification obligations to Clean Harbors.

51. CBS thereafter ceased monitoring and remediation at the Facility despite demands by Clean Harbors. Therefore, CBS has breached the indemnity obligations owed to Clean Harbors and Clean Harbors has suffered and will continue to suffer damages due to CBS's wrongful actions.

WHEREFORE, Clean Harbors requests the Court enter judgment in its favor under Count VIII and award it damages in an amount to be proven at trial, but in excess of $75,000, plus costs of this action, attorneys' fees if and as allowed by law, and any other relief the Court deems fair and just.

## DEMAND FOR JURY TRIAL

Clean Harbors demands a trial by jury on all claims so triable.

3784702v1

## DESIGNATION OF PLACE OF TRIAL

Plaintiff Clean Harbors designates Kansas City, Kansas, as the place of trial.

SHOOK, HARDY & BACON L.L.P.

By: *[signature]*
David R. Erickson, KS Bar #12539
Mathew L. Larsen, MO Bar #60168

2555 Grand Blvd.
Kansas City, Missouri 64108-2613
Telephone: 816.474.6550
Facsimile: 816.421.5547

ATTORNEYS FOR PLAINTIFFS CLEAN
HARBORS, INC. AND CLEAN HARBORS
COFFEYVILLE, LLC

3784702v1

# EXHIBIT A

## ASSIGNMENT OF INDEMNIFICATION RIGHTS AND CLAIMS
### (Coffeyville, Kansas)

This Assignment of Indemnification Rights and Claims is executed as of this ___ day of September, 2002 by Safety-Kleen Corp., f/k/a Laidlaw Environmental Services, Inc., f/k/a Rollins Environmental Services, Inc., and Safety-Kleen Services, Inc. ("Safety-Kleen Services") (collectively "Assignor") in favor of Clean Harbors, Inc. ("Assignee") pursuant to that certain Acquisition Agreement, dated February 22, 2002 between Safety-Kleen Services and Assignee (the "Acquisition Agreement").

Whereas Assignor has certain indemnification rights and claims under Article 12 of that certain Stock Purchase Agreement dated March 7, 1995 (the "Agreement") between Westinghouse Electric Corporation ("Westinghouse") and Rollins Environmental Services, Inc. ("Rollins"), pertaining to, among others, a facility in Coffeyville, Kansas, pursuant to which, among other things, Westinghouse, as Seller, expressly agreed in Section 12.10.1 of the Agreement to perform certain groundwater remediation work, and to indemnify and hold harmless Assignor, its Affiliates and assigns, as Buyer, for Certain Environmental Matters, as set forth in Article 12 of the Agreement;

Whereas, in Section 1.1(b)(xiv) of the Acquisition Agreement, among others, Safety-Kleen Services agreed to assign to Assignor all indemnification rights and claims relating to the Business or the Acquired Assets, as defined in the Acquisition Agreement, and such assignment includes, without limitation, the indemnification claims and indemnification rights of Assignor under Article 12 of the Agreement, and Assignor desires to assign those rights herein:

Now therefore, in consideration of the forgoing premises and for other good and valuable consideration received pursuant to the Acquisition Agreement, Assignor agrees as follows:

1. **Assignment of Indemnification.** Assignor hereby assigns and transfers to Assignee all of Assignor's rights, claims, and causes of action against Westinghouse Electric Corporation and its successors and assigns arising under Article 12 of the Agreement, including but not limited to those arising under Section 12.10.1 of the Agreement relating to groundwater remediation by Westinghouse Electric Corporation.

2. **Governing Law.** This document shall be governed by the laws of the State of Delaware.

3. **Miscellaneous.** This Assignment shall be binding upon the parties hereto and upon their respective successors and assigns, and Assignor hereby agrees to execute and deliver to Assignee and further documentation necessary to carry out the intent and purpose of this Assignment.

WITNESS the execution hereof under seal as of the date of the Closing, as defined in the Acquisition Agreement.

SAFETY-KLEEN CORP.

By: _____
Its duly authorized SVP General Counsel

SAFETY-KLEEN SERVICES, INC.

By: _____
Its duly authorized Sole Director