IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLEAN HARBORS, INC. and              )
CLEAN HARBORS COFFEYVILLE, LLC,      )
                                     )
             Plaintiffs,             )
                                     )
v.                                   )          Case No. 10-2017-JPO
                                     )
CBS CORPORATION,                     )
                                     )
             Defendant.              )
                                     )

## MEMORANDUM AND ORDER

This is an environmental cleanup case brought pursuant to the Resource Conservation

and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA") and under a variety of state law

theories of recovery.   Highly summarized, Clean Harbors, Inc. and Clean Harbors

Coffeyville, LLC (collectively "Clean Harbors") are suing CBS Corporation for damages

arising from environmental contamination at a waste-management facility in Coffeyville,

Kansas.  Clean Harbors currently owns the facility; CBS's predecessors in interest used to

own the facility.  The case is now before the undersigned U.S. Magistrate Judge, James P.

O'Hara,[1] on CBS's motion to strike rebuttal expert reports **(doc. 73)**,[2] CBS's motion for

---

[1]On November 4, 2011, with the approval of the then-presiding U.S. District Judge, Kathryn H. Vratil, the parties consented to Judge O'Hara presiding over all issues in this case (doc. 89).

[2]CBS's counsel has informed the court via email that CBS does not object to Clean Harbors referring to or relying on the contested rebuttal expert reports in opposition to CBS's summary judgment motion.  But CBS maintains its objection to Clean Harbors relying on the reports at trial and asks the court to rule on its motion to strike the reports if any portion of

summary judgment (**doc. 87**), CBS's motion to strike an affidavit filed by Clean Harbors in opposition to the summary judgment motion, and also to strike a theory of relief not preserved in the final pretrial order (**doc. 98**), Clean Harbors's motion for leave to respond to CBS's submission of supplemental authority (**doc. 108**), and CBS's motion for leave to file supplemental submissions (**doc. 110**).[3]   The motions have been fully briefed.

## I.   CBS's Motion to Strike

### A.      DeJong Affidavit

Victor DeJong was an employee of Westinghouse, a predecessor in interest to CBS, from 1966 to 1979 and from 1984 to 1988.   He worked for Aptus (a subsidiary of Westinghouse, which owned the Coffeyville facility) from 1988 to 1992.   DeJong signed an affidavit on December 7, 2011, shortly before Clean Harbors filed its response to CBS's motion for summary judgment.   Clean Harbors relies on DeJong's affidavit to oppose summary judgment and to support its piercing-the-corporate-veil theory of recovery. Because Clean Harbors did not disclose DeJong as a witness before discovery closed, CBS

---

the complaint survives summary judgment.   Because the court grants CBS summary judgment, the motion to strike the expert reports is moot.

[3]CBS has requested leave to file supplemental submissions relating to their motion to strike Clean Harbors's rebuttal experts (doc. 73) and their motion for summary judgment (doc. 87).   Because CBS's motion to strike Clean Harbors's rebuttal experts is moot, as noted above, so too is that portion of their request to submit supplemental submissions.   And because the supplemental information that relates to CBS's motion for summary judgment pertains to only Clean Harbors's damages expert and piercing-the-corporate-veil theory, it is also moot in light of the court's holding that RCRA injunctive relief is not appropriate in this case.

seeks to strike the affidavit and Clean Harbors's reliance on it in response to CBS's motion for summary judgment.

Federal discovery rules require parties to, "without awaiting a discovery request, provide to the other parties . . . the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."[4]   A party must "supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[5]   These rules are enforced by the threat of sanction—"[i]f a party fails to . . . identify a witness as required by Fed. R. Civ. P. 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[6]   In addition to or instead of this sanction, the court "(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi)."[7]

---

[4]Fed. R. Civ. P. 26(a)(1).

[5]Fed. R. Civ. P. 26(e)(1)(A).

[6]Fed. R. Civ. P. 37(c)(1).

[7]*Id.*

The "exclusion of evidence presented out of time is 'automatic and mandatory' unless the violation was either justified or harmless."[8]  Clean Harbors argues the court should not strike DeJong's affidavit because (1) Clean Harbors first found out DeJong had potentially relevant information after discovery closed; (2) the parties were allowed take depositions after discovery closed; (3) Clean Harbors may rely on DeJong's affidavit even if he is not on its witness list; and (4) untimely disclosure would not harm CBS.

First, the court finds Clean Harbors could have discovered DeJong's identity, and that he may have had relevant information, months before December 2011.  Clean Harbors simply had to review the documents it disclosed to CBS or the documents CBS disclosed to it.  On August 31, 2011, Clean Harbors disclosed a letter to DeJong from the U.S. Environmental Protection Agency ("EPA"), regarding Kansas waste removal codes and an "Emergency Contingency Plan" for the facility.  The plan listed DeJong as vice president and general manager of the facility.[9]  In August 2011, CBS produced documents to Clean Harbors containing DeJong's name and role as former general manager.[10]

Second, although the pretrial order allowed the parties to take depositions after discovery closed, this exception applied to only two expert witnesses and unopposed discovery, "so long as it does not delay the briefing of or ruling on dispositive motions or

---

[8]*Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008) (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

[9]Doc. 103 at 2 & ex. 1 attached thereto.

[10]*Id.* & ex. 2 attached thereto.

other pretrial preparations."[11]  The pretrial order does not relieve any party of complying with the mandatory disclosure requirements in Fed. R. Civ. P. 26(a) or (e).

Third, Clean Harbors's reliance on *Taylor v. St. Louis Southwestern Railway Co.*[12] to distinguish affidavits in opposition to summary judgment from trial testimony is unpersuasive.  The sanction in Fed. R. Civ. P. 37(c)(1) expressly applies to undisclosed witnesses on which a party relies "to supply evidence on a motion."[13]  *Taylor* was decided three years before Fed. R. Civ. P. 37(c) was amended to include this sanction for nondisclosure.[14]  Also unpersuasive is Clean Harbors's attempt to distinguish two other cases that are on point and strongly favor striking the DeJong affidavit.[15]

_____

[11]Doc. 90 at 41.

[12]746 F. Supp. 50, 53 (D. Kan. 1990).

[13]*See Vesom*, 279 F. App'x at 632; Fed. R. Civ. P. 37(c) 1993 advisory committee's note ("The automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at trial, at a hearing, or on a motion, such as one under Rule 56.").

[14]*See* Fed. R. Civ. P. 37(c) 1993 advisory committee's note.

[15]*See Vesom*, 279 F. App'x at 632-33 (striking affidavits of witnesses disclosed for first time in plaintiff's response to defendant's motion for summary judgment, where plaintiff had time to disclose before filing summary judgment response); *Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1229-30 (D. Kan. 2008) (striking affidavits disclosed for first time in plaintiff's response to defendant's motion for summary judgment even though plaintiffs found out about the witnesses only days before filing response, and where allowing plaintiffs to rely on the affidavits would require reopening discovery and probably postponing trial); *see also Guang Dong Light Headgear Factory v. ACI Int'l, Inc.*, No.03-4165-JAR, 2008 WL 53665, at *1 (D. Kan. Jan. 2, 2008) (striking affidavits of witnesses first disclosed in defendants' response to motion for summary judgment because they did not show failure to disclose was substantially justified).

Clean Harbors also argues it timely disclosed DeJong as a witness because final witness lists are not due until twenty-one days before trial, and trial has not yet been scheduled.  As noted above, the pretrial order does not authorize any party to shirk the mandatory disclosure requirements in Fed. R. Civ. P. 26(a) or (e).  Clean Harbors argues Fed. R. Civ. P. 26(e) does not apply here because CBS knew of DeJong as early as November 8, 2011, if not earlier, and the duty to supplement initial disclosures is limited to "additional or corrective information . . . not otherwise . . . made known to the other parties during the discovery process or in writing."[16]  But just because CBS knew of DeJong does not mean that it knew Clean Harbors would rely on DeJong as a witness.

Fourth, Clean Harbors contends that its untimely disclosure of DeJong will not harm CBS because the trial date has not yet been set and because Clean Harbors will agree to let CBS depose DeJong before trial.  The court disagrees.  Allowing this new evidence at the summary judgment stage will prejudice CBS.  It had no notice of Clean Harbors relying on DeJong as a witness until after CBS filed its motion for summary judgment.  CBS did not depose DeJong during discovery and did not explore the matters covered in DeJong's affidavit because Clean Harbors had not identified him as a witness.  As in *Sinks*, allowing CBS the opportunity to cure this prejudice would require reopening discovery, re-briefing the pending summary judgment motion, and possibly scheduling trial to begin on a later date

---

[16]Fed. R. Civ. P. 26(e).

than it otherwise would have.[17]

Clean Harbors has not shown that its failure to disclose DeJong as a witness was substantially justified or harmless.  The court therefore strikes the DeJong affidavit.[18]  Even if the court considered the affidavit, it would not change the court's decision to grant summary judgment in favor of CBS, as discussed below.

### B.   Piercing-the-Corporate-Veil Theory

CBS seeks to strike from Clean Harbors's response any reference to or reliance on Clean Harbors's piercing-the-corporate-veil theory because Clean Harbors did not properly preserve the theory in the pretrial order.  The pretrial order (doc. 90) controls the course of the action unless modified by the court in accordance with D. Kan. Rule 16.2(c).[19]  The purpose of the pretrial order is to "insure the economical and efficient trial of every case on its merits without chance or surprise."[20]  Pretrial orders "should be liberally construed to cover any of the legal or factual theories that might be embraced by their language."[21]  But

---

[17]565 F. Supp. 2d at 1229-30.

[18]*See* Fed. R. Civ. P. 37(c).

[19]Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(c).

[20]*Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D. Kan. 1998) (quoting *Smith v. Ford Motor Co.*, 626 F.2d 784, 795 (10th Cir. 1980)) (internal quotation marks omitted).

[21]*Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)) (internal quotation marks omitted).

this "does not require courts to fabricate a claim that a plaintiff has not spelled out."[22]  Any "claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[23]  The decision to exclude facts or issues as not found in the pretrial order is committed to the trial court's sound discretion.[24]

In exercising this discretion, the court "should not be inflexible."[25]  Rather, it should strike a balance between "too-easy modification" that would encourage carelessness in the preparation and approval of the initial order and "unswerving insistence upon every provision, under all circumstances," which may work an injustice in individual cases.[26]

In opposition to the motion to strike, Clean Harbors argues (1) it reasonably identified the theory in the pretrial order, (2) it didn't need to designate piercing the corporate veil as a separate and independent theory of liability, and (3) CBS has known piercing the corporate veil is an issue in the case.

First, Clean Harbors relies on seven passages in the pretrial order to show it

---

[22]*Schaub v. Newton Wall Co./UCAC*, 153 F. App'x 461, 465-66 (10th Cir. 2005) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999)) (internal quotation marks omitted).

[23]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[24]*Koch*, 179 F.R.D. at 596 (citing *Smith*, 626 F.2d at 795).

[25]*Perry v. Winspur*, 782 F.2d 893, 896 (10th Cir. 1986).

[26]*Koch*, 179 F.R.D. at 596 (quoting *Perry*, 782 F.2d at 896) (internal quotation marks omitted).

reasonably identified the piercing-the-corporate-veil theory.[27]  Each passage involves claims or defenses regarding CBS's liability for the activities of "other entities for whom CBS is allegedly responsible,"[28] its "predecessors (Westinghouse, Aptus, and/or NEI), for whom CBS is liable,"[29] or "its predecessors for whom Clean Harbors can establish that CBS is responsible."[30]

The pretrial order nowhere mentions Clean Harbors's piercing-the-corporate-veil theory; it only alleges CBS's liability for the acts of its predecessors in interest.  Liability as a successor in interest, however, is different than liability imposed by piercing the corporate veil.  And to the extent the pretrial order more generally states CBS is responsible for the actions of its subsidiaries, this also does not fairly encompass Clean Harbors's piercing-the-corporate-veil theory.  Unlike successor or vicarious liability, imposing liability by piercing the corporate veil is based on an abuse of the corporate form that justifies disregarding the protections of the corporation when "allowing the legal fiction of a separate corporate structure would result in injustice."[31]

---

[27]Doc. 102 at 7-8.

[28]*Id.* at 7 (quoting doc. 90 at 2, n.1) (internal quotation marks omitted).

[29]*Id.* at 7-8 (quoting doc. 90 at 10-11) (internal quotation marks omitted); *see also id.* at 8 (quoting doc. 90 at 18-21).

[30]*Id.* at 8 (quoting doc. 90 at 24) (internal quotation marks omitted).

[31]*Doughty v. CSX Transp., Inc.*, 258 Kan. 493, 499-500, 905 P.2d 106, 111 (1995) ("The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and

The pretrial order is extremely detailed in setting forth the facts and legal theories upon which Clean Harbors relies—it spans fifty-one pages and tracks an equally detailed complaint (doc. 1). Given this level of pleading detail, which this court has come to expect from the excellent lawyers who represent Clean Harbors, to now suggest the court should read between the lines to find a wholly unstated theory of liability defies common sense. It would also defy the purpose of having a pretrial order in the first place. The bottom line is that the court finds the pretrial order does not reasonably identify Clean Harbors's piercing-the-corporate-veil theory.

Second, Clean Harbors argues the pretrial order didn't have to specifically mention the piercing-the-corporate-veil theory because it is not a stand-alone claim for recovery, but is "embraced within and inherent in the legal and factual issues listed in the pretrial order."[32] Clean Harbors relies primarily on *Theno*, which involved a Title IX claim for gender-based

───────────────

assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties."); *Dean Operations, Inc. v. One Seventy Assocs.*, 257 Kan. 676, 680-81, 896 P.2d 1012, 1016 (1995) ("In the absence of fraud or other invidious and vitiating circumstances, the fact that one corporation is instrumental in the formation of another corporation and owns nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation. . . . The fiction of separate corporate identities of two corporations will not be extended to permit one of the corporations to evade its just obligations; to promote fraud, illegality, or injustice; or to defend crime. . . . The courts will disregard the fiction of a separate legal entity when there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for its principal.").

[32]Doc. 102 at 9 (quoting *Theno v. Tonganoxie United Sch. Dist. No. 464*, 394 F. Supp. 2d 1299, 1303-04 (D. Kan. 2005)) (internal quotation marks omitted).

harassment.[33]  In *Theno*, the pretrial order clearly preserved a gender-based harassment claim, but did not specify the plaintiff's gender-stereotyping theory.[34]  The court held the plaintiff's gender-stereotyping theory was "not . . . an entirely new claim or theory of recovery," but "merely a subsidiary issue" subsumed within the issues listed in the pretrial order.[35]

Clean Harbors's piercing-the-corporate-veil theory, however, is different.  Here, the pretrial order speaks primarily of CBS's liability for acts of its predecessors for whom CBS is liable, including Westinghouse, Aptus, and NEI.  As already noted, liability for acts of predecessors in interest is fundamentally different than liability based on piercing the corporate veil.  Moreover, to pierce the corporate veil Clean Harbors must show, based on a laundry list of factors, that the circumstances justify doing so.[36]  The pretrial order does not address most of these factors.  Clean Harbors's claims, therefore, do not inherently include its piercing-the-corporate-veil theory.  Although piercing the corporate veil is a potential theory for showing CBS was an owner/operator under RCRA, it does not automatically preserve the theory when the theory is nowhere to be found in the pretrial order.[37]

Third, Clean Harbors argues CBS has known piercing the corporate veil is an issue

---

[33]394 F. Supp. 2d at 1303-04.

[34]*Id.*

[35]*Id.*

[36]*Dean Operations*, 257 Kan. at 682, 896 P.2d at 1018-19 (listing 10 factors for determining whether a subsidiary corporation is an instrumentality of the parent).

[37]*See Mandeville v. Quinstar Corp.*, No. 98-1408-MLB, 2000 WL 1375264, at *4 (D. Kan. Aug. 29, 2000).

in this case.   But just because CBS has disputed its liability for the acts of Aptus, its

subsidiary, does not mean that it knew Clean Harbors intended to rely on piercing the

corporate veil to hold CBS liable.   And the reference to "corporate structure" by Clean

Harbors's Fed. R. Civ. P. 30(b)(6) witness or the reference to the relationship between CBS

and Aptus by CBS's lawyer is insufficient to put CBS on notice of Clean Harbors's piercing-

the-corporate-veil theory.

The pretrial order does not preserve Clean Harbors's piercing-the-corporate-veil

theory.   Clean Harbors has therefore waived it, and CBS's motion to strike is granted.   Even

if the pretrial order did preserve Clean Harbors's piercing-the-corporate-veil theory, it does

not contain sufficient facts to support the theory.   Moreover, as discussed below, injunctive

relief is inappropriate for Clean Harbors's RCRA claim.   So even if Clean Harbors had

preserved a piercing-the-corporate-veil theory, CBS would still be entitled to summary

judgment on the RCRA claim.

## II.  CBS's Motion for Summary Judgment

### A.    Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.[38]   A factual dispute is "material" only if it "might affect the outcome of the suit under

---

[38]*See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986);
*Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).

the governing law."[39]  A "genuine" factual dispute requires more than a mere scintilla of evidence.[40]

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.[41]  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof.[42]  The nonmoving party may not rest on its pleadings but must set forth specific facts.[43]

The court views the record in the light most favorable to the nonmoving party.[44]  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.[45]  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary

---

[39]*Liberty Lobby*, 477 U.S. at 248.

[40]*Id.* at 252.

[41]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).

[42]*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

[43]*Applied Genetics*, 912 F.2d at 1241.

[44]*Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991).

[45]*Liberty Lobby*, 477 U.S. at 250-51.

judgment in the mere hope that something will turn up at trial.[46]  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[47]

**B.     Facts[48]**

The subject property is a facility located in Coffeyville, Kansas.  It sits on roughly 406 acres at the southern end of the Coffeyville Industrial Park.  The facility is contaminated with various hazardous waste materials.

**1.     Ownership of the Facility**

As of August 1, 1988, Aptus owned and operated the facility.  It performed services related to the transportation, storage, laboratory analysis, and incineration of certain types of hazardous waste.  National Electric, Inc. ("NEI") and Westinghouse Specialty Services, Inc., a wholly owned subsidiary of Westinghouse Electric Corporation (collectively "Westinghouse"), owned Aptus.  In September 1988, Westinghouse bought NEI.  In February 1991, Westinghouse Specialty Services merged with NEI.  So from September 1988 through March 1995, Westinghouse owned NEI, which in turn owned Aptus, which owned and operated the facility.

On March 7, 1995, under a stock purchase agreement ("SPA"), Westinghouse sold

---

[46]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[47]*Liberty Lobby*, 477 U.S. at 251-52.

[48]The following facts are either uncontroverted, deemed admitted, or, where controverted, viewed in the light most favorable to Clean Harbors, the nonmovant. Immaterial facts and those not properly supported by the record are omitted.

NEI to Rollins Environmental Services.  Shortly thereafter, Westinghouse merged with CBS.  After a merger with Viacom and several name changes, the resulting entity took the name CBS.  CBS is therefore Westinghouse's successor in interest.

In February 2002, Clean Harbors purchased the facility from Safety-Kleen—a successor in interest to Rollins—as part of the sale of certain assets during Safety-Kleen's bankruptcy proceedings.[49]  In connection with the sale, Safety-Kleen assigned to Clean Harbors its claims and indemnification rights under Article 12 of the SPA.  CBS received notice of the sale and the bankruptcy court approved it.  The parties dispute, however, whether CBS received notice of the assignment of rights under the SPA.  They also dispute whether the assignment was valid.  Clean Harbors currently owns the facility.

As part of the bankruptcy proceedings, however, Safety-Kleen and Viacom (a predecessor in interest to CBS) stipulated to reject the SPA under 11 U.S.C. § 365.  The bankruptcy court approved the stipulation.  Clean Harbors subsequently moved to set aside the stipulation and to declare that Safety-Kleen's rejection of the SPA did not affect Clean Harbors's rights under the SPA as against CBS.  The bankruptcy court denied the motion.  Clean Harbors appealed the decision to the district court, which has not yet ruled.[50]  On August 1, 2003, the Delaware Bankruptcy Court confirmed the first amended joint plan of reorganization.  On April 5, 2004, Safety-Kleen was dissolved as a corporate entity.

---

[49]*See In re Safety-Kleen Corp.*, No. 00-2303 (PJW) (Bankr. D. Del.).

[50]*See Clean Harbors Envt'l Servs., Inc. v. CBS Corp.*, No. 09-721-GMS (D. Del.).

### 2.      The SPA

The SPA governed Westinghouse's sale of NEI to Rollins.   With respect to contamination at the facility, Article 12 of the SPA required Westinghouse to "perform such investigation, remediation or corrective action, in full compliance with the requirements of any Governmental Authority."[51]  This included but was not limited to the ongoing RCRA corrective action.    Under the SPA, Westinghouse's responsibility to investigate and remediate contamination continued until it met the established remediation cleanup levels required by the final remediation plan and maintained the levels for one year.

### 3.      Contamination at Facility

The parties dispute whether CBS and its predecessors in interest caused the contamination at the facility.   CBS contends the facility was contaminated before its predecessors became involved.   It argues the prior owners' handling of volatile organic compounds, metal plating processes, and their storage, treatment, or disposal of waste resulting from these processes caused the contamination.

The facility is contaminated with the following hazardous substances and hazardous waste constituents:

    (a)     1,1-Dichloroethene,
    (b)     Tetrachloroethene,
    (c)     Trichloroethene,
    (d)     Arsenic,
    (e)     Chromium,
    (f)     Benzene,

_____

[51]SPA ¶ 12.10.1.1 (doc. 97, ex. 67).

(g)     Carbon tetrachloride,
(h)     Chlorobenzene,
(i)     Chloroform,
(j)     1,2-Dichloroethane,
(k)     1,2-Dichloroethene,
(l)     Methylene chloride, and
(m)     Vinyl chloride.

The EPA has also directed Clean Harbors to investigate for 1,4-Dioxane in the groundwater.

        The parties dispute whether a pathway exists between harmful waste at the facility and potential receptors, and whether the harmful waste will reach any receptors at harmful levels. An Annual Remedy Effectiveness and Performance Monitoring Report for 2009 stated the effectiveness of the east wing of the funnel and gate system may be decreasing, and the plume of contamination may be flowing around the gate instead of filtering through it.  The parties dispute whether the plume is actually circumventing the funnel and gate, and even if it is, whether the plume could endanger human health or the environment.  If the plume is circumventing the funnel and gate system, it could create a new pathway of exposure to offsite landowners.  Clean Harbors's neighbor, American Insulated Wire, has contacted Clean Harbors about groundwater contamination moving offsite from the facility.

        In 2007 through 2010, onsite groundwater and soil data, and offsite groundwater data indicated hazardous contamination exceeded established cleanup levels.  CBS disputes that the data indicates hazardous contamination above established cleanup levels at the points of compliance.  To date, both onsite and offsite soil and groundwater levels have exceeded cleanup levels established by the EPA.  Again, CBS disputes whether hazardous contamination exceeds established cleanup levels at the points of compliance. CBS's expert

has testified he thinks cleanup at the facility will go on forever.

### 4.    EPA Consent Order and RCRA Permit

On August 30, 1988, the EPA issued a consent order to Aptus regarding the facility. It stated the presence of hazardous wastes at the facility or the release of hazardous wastes from the facility may present a substantial hazard to human health or the environment. The purpose of the order was to ascertain—through monitoring, testing, analysis, and reporting—the nature and extent of any hazard the facility may present to human health or the environment. The EPA subsequently issued a RCRA permit requiring corrective measures to remediate contamination at the facility. In 1998, SECOR International, Inc., prepared a risk analysis report for the EPA which found two completed pathways of exposure.

When Clean Harbors bought the facility in 2002, it knew the EPA had issued a RCRA permit regarding the facility, which required the permittee to take corrective measures. Clean Harbors also knew, however, that through various settlements, Westinghouse had received money in exchange for accepting responsibility for future cleanup.

In 2002, Clean Harbors transferred the RCRA permit to its name. Under the permit, Clean Harbors is responsible for implementing the required corrective measures. In January 2005, the EPA proposed the funnel and gate remediation system as the final cleanup measure. The funnel and gate system was installed at the facility, but the parties dispute who installed it. CBS contends Aptus implemented it. Clean Harbors asserts Westinghouse implemented it and CBS expanded it.

The EPA evaluated the funnel and gate system based on four threshold criteria: (1) overall protection, (2) attainment of media cleanup standards, (3) controlling the sources of releases, and (4) compliance with waste management standards.  It found that the corrective measure satisfied each of these criteria.  It also proposed monitored natural attenuation for two plumes of contamination, established onsite and offsite cleanup levels for soil and groundwater contamination, required institutional controls and deed restrictions, and required monitoring to ensure the proposed remedies were working as expected.

In August 2005, the EPA selected the funnel and gate as the final corrective measure at the facility.  The EPA found this remedy appropriate and protective of human health and the environment.  At around the same time, the EPA modified Clean Harbors's RCRA permit.  The modification described the selected remedy as including (1) a funnel and gate system, (2) groundwater treatment system, and (3) institutional controls.  It stated these remedies will protect human health and the environment, control the sources of releases so as to reduce or eliminate to the maximum extent practicable further releases that might pose such a threat, and meet all applicable federal, state, and local laws and regulations.  It also listed cleanup levels, described Clean Harbors's monitoring, reporting, remedy review, corrective measures completion report, and financial assurance obligations.

Clean Harbors later applied to renew its RCRA permit.  On April 12, 2010, the EPA renewed the permit.  It requires Clean Harbors to implement and maintain the corrective measures identified in the final corrective measures decision, and to monitor and report on the effectiveness and performance of the remedy.  It also allows the EPA to select a new

remedy if necessary, and to require Clean Harbors to undertake additional investigation to select a new remedy.  If action is required to protect human health or the environment or to prevent or minimize the further spread of contamination while long-term remedies are pursued, the EPA may require Clean Harbors to implement interim measures.

The 2010 RCRA permit clarified the cleanup levels and required Clean Harbors to further investigate contamination in the soil and groundwater.  The EPA specifically instructed Clean Harbors to investigate the apparent ineffectiveness of monitored natural attenuation, the groundwater contamination plume that appeared to have circumvented the funnel and gate system, and the possible presence of 1,4-dioxane—a new contaminant of concern that had not been previously addressed.

In issuing the permit, the EPA stated the corrective measures for the facility were protective of human health and the environment.  It required annual monitoring and reporting to determine whether these remedies effectively protect human health and the environment, and required Clean Harbors to give financial assurances for remediation in the event it becomes unable to perform its obligations.  The parties dispute whether the permit changed Clean Harbors's corrective measures obligations.  They also dispute the purpose of the financial assurances.  Clean Harbors contends the purpose of financial assurances is not to pay for the cost of all potential groundwater and soil remediation at the facility, but to maintain the approved corrective measures for as long as they have been approved.

Under the 2010 RCRA permit, Clean Harbors must notify the EPA within twenty-four hours if it becomes aware of any occurrence that may endanger human health or the

environment.  Clean Harbors has not provided any such notification.  It contends, however, that since 1988 the EPA has been aware of the substantial hazard the soil and groundwater contaminants present.  As the permit requires, Clean Harbors has provided annual reports to the EPA.  Those reports indicate groundwater apparently flowing around the wall of the funnel and gate system, and that monitored natural attenuation appears not to be working as planned in 2005.

The permit requires Clean Harbors to take all reasonable steps to minimize releases to the environment and carry out such measures as are reasonable to prevent significant adverse impacts on human health or the environment.  It also requires Clean Harbors to take interim measures to abate any imminent and substantial endangerment to human health or the environment.  The parties dispute whether Clean Harbors has implemented any such measures and whether the EPA has directed Clean Harbors to take such measures.  Clean Harbors asserts that it has complied, and intends to comply, with all relevant corrective measure provisions contained in the RCRA permit.

In its Annual Remedy Effectiveness and Performance Monitoring Reports for 2007 through 2010, Clean Harbors did not advise the EPA it believed the conditions at the facility presented an imminent and substantial endangerment to human health and the environment, and concluded that "[n]o recommendations are offered at the present time for maintenance, modification, or repair of the engineered remediation systems."  Clean Harbors contends the EPA has known there is or may be an imminent and substantial hazard since 1988 when it issued the consent decree.

In September 2011, the EPA lowered the allowable toxicity level for TCE.  The new toxicity level for that substance may result in more stringent cleanup levels that are more difficult to reach.

### 5.   CBS Involvement at Facility

From September 1988 to March 1995, Westinghouse (CBS's predecessor in interest) owned NEI which in turn owned Aptus, which owned the facility.  Operations at the facility included transformer cleaning and rehabbing.  Westinghouse sought 100% control of Aptus to free Westinghouse Electric from the constraints imposed by the arrangement with NEI and to obtain full benefit of Aptus growth and profitability.  Westinghouse sought to integrate Aptus into its portfolio of environmental services.  In obtaining 100% control of Aptus, Westinghouse expected full participation in Aptus management, integration of Aptus into the overall Westinghouse strategy, and consolidation of the sales and operating profit to obtain the advantages of Aptus growth.

For example, Westinghouse employees took jobs at Aptus.  Marv Kolesar, a Westinghouse Electric employee, became president of Aptus.  Westinghouse's manager of permitting and compliance, traveled to Coffeyville to meet with city officials and employees and to "fly the Westinghouse flag."  On at least one occasion, Westinghouse and Aptus shared in-house legal counsel, and Westinghouse attorneys negotiated settlements with the EPA on behalf of Aptus.  Doug Johnson, the PCB services manager for Westinghouse said: "We know the facility's going to be run right because we have a say in it."  Although CBS denies it owned or operated the facility, several documents sent by or on behalf of CBS

describe it as a former owner/operator of the facility.

Westinghouse Electric also performed audits of the facility to ensure it followed Westinghouse practices and procedures.  Based on the audits, it would make operational changes—the facility would prepare a response to the audit indicating how it would correct the issues identified in the audit.  Westinghouse would follow up with the facility until it completed all action items in the plan.

Westinghouse required Aptus to use waste disposal companies Westinghouse had preapproved.  It required Aptus to submit all disposal contracts and scrap material arrangements for review and approval.  Westinghouse also required Aptus to submit all applications for, or revisions of, permits.  Before Aptus could use a subcontractor at the facility, it had to get preapproval from Westinghouse.  Westinghouse employees also received, and sometimes commented on, work plans and monthly reports summarizing the facility's activity.  Employees at the facility were subject to Westinghouse's limit-of-authority policy requiring Westinghouse approval for significant operational expenses.

While Westinghouse owned NEI, numerous spills occurred at the facility.  The parties debate, however, whether the spills contributed to the contamination at issue in this case.  In 1988, Aptus improperly disposed of an underground storage tank containing chlorinated solvents.  Also during Westinghouse's ownership of NEI, the facility pumped contaminated groundwater out of a degreaser sump into a drainage ditch on the property.  Because the containment systems at the facility were compromised while Aptus owned it, hazardous waste was released into the soil and groundwater at the incinerator and contributed to

contamination at the facility.

With respect to remediation at the facility, on at least one occasion Westinghouse paid for remediation services, paid a fine, and entered into an agreement with an environmental remediation company to perform groundwater and soil remediation services at the facility. Even after selling NEI, Westinghouse investigated and remediated soil and groundwater contamination at the facility.  It installed, owned, and operated an air stripping tower used as part of the pump-and-treat remediation system.  After Safety-Kleen sold the facility to Clean Harbors in 2002, CBS/Viacom continued to work with the EPA to investigate and remediate soil and groundwater contamination at the facility.  CBS continued remediation even after it received notice of the purported assignment of Article 12 rights to Clean Harbors.  In January 2006, CBS sent a letter to Clean Harbors indicating it had completed its obligation to remediate soil and groundwater at the facility.  Because of ongoing negotiations between the parties, in March 2006, CBS explicitly retracted the letter.  CBS contends, however, that its retraction was conditioned on bankruptcy court approval of a stipulation between the parties, which never occurred.  CBS has continued to pay utility costs for part of the remediation system since 2008.

### 6.      Future Remediation

In the early 1990s, Westinghouse, Aptus, and past owners of the facility sued each other for damages for groundwater contamination at the facility.  In 1995, shortly before Westinghouse merged with CBS, it reached a settlement agreement whereby Westinghouse received $2.7 million in return for indemnification and for shouldering responsibility for

future cleanup.  In other litigation, creditors agreed to release a nearly $2 million balance on a promissory note in exchange for indemnification and an agreement that Westinghouse would cover future costs relating to groundwater contamination at the facility.  In 1996, Westinghouse received $175,000 from the U.S. Department of Defense in return for indemnification and paying future costs relating to the groundwater contamination at the facility.  Clean Harbors was not party to these lawsuits.  The money was paid to Westinghouse, not Aptus.  CBS states that it has spent more on remediation at the facility than it received from the settlements.  The parties dispute whether CBS has an ongoing obligation to remediate groundwater contamination at the facility under the SPA.

The certificates of insurance Clean Harbors submitted to the EPA and/or the Kansas Department of Health and Environment covering from September 6, 2006, to March 19, 2009, showed a financial assurance amount ranging between $2,338,907 and $2,471,548. Under RCRA, Clean Harbors must notify the EPA within 10 days if it becomes aware of information indicating that any financial assurance instrument provided under the permit is inadequate or no longer satisfies the requirements.  Clean Harbors has not notified the EPA of an increase in the estimated cost of the remediation.

Clean Harbors's expert opines that future investigation, remediation, operation, maintenance, monitoring, and reporting requirements at the site will cost roughly $8.45 million.  The parties dispute, however, whether the expert used proper methods to arrive at that amount.

C.    *Hawks v. City of Coffeyville* **Bar Order**

CBS argues Clean Harbors's claims are prohibited by a "bar order" this court issued in previous litigation over environmental cleanup at the facility.  The order states in part as follows:

> Subject to the rights of the Settling Parties under the terms of the settlement agreements, any and all claims by non-Settling Parties and any and all future claims by *any party* against the Settling Parties arising out of or related in any way to the cleanup of the Coffeyville, Kansas groundwater contamination site that is the object of this litigation, are barred, except that such bar order shall not apply to claims against plaintiffs arising out of conditions at that portion of the site known as Tract C or referred to in plaintiffs' complaint as Site II.[52]

CBS argues the term "any party" includes anyone and everyone who might bring a claim against the Settling Parties in the future.  This seems an unreasonably strained and aggressive reading of the term "party."  In context, the term "party" most naturally includes "Settling Parties" and "non-Settling Parties," but not anyone and everyone else.  The main case on which CBS relies—*Barton Solvents, Inc. v. Southwest Petro-Chem, Inc.*—does not contradict this interpretation.[53]  Thus the order should be read to bar "any and all future claims by any [non-Settling Party or Settling Party] against the Settling Parties arising out of or related in any way to the cleanup of the [facility]."  As such it does not bar Clean

---

[52]Order in Civil Action No. 93-2555-KHV dated Jan. 9, 1996 (doc. 88, ex. 20) (emphasis added).

[53]834 F. Supp. 342 (D. Kan. 1993) (bar order barred "all parties *in this action* from asserting claims against the Settlors in the future") (emphasis added).  CBS also relies on *United States v. Mallinckrodt, Inc.*, No. 4:02CV01488 ERW, 2006 WL 3331220 (E.D. Mo. Nov. 15, 2006).  But the settlement agreement in that case is very different than the bar order at issue here.  That settlement agreement expressly barred claims "by any *Person (whether or not a Party to the lawsuit)*." *Id.* at *1 n.2 (emphasis added).

Harbors's claims in the present case because it was not a party to the prior suit.

**D.    RCRA Claim**

To prevail on its RCRA claim, Clean Harbors must show three things:  (1) CBS was an owner or operator of a solid or hazardous waste treatment storage or disposal facility; (2) CBS contributed to the handling, storage, treatment, transportation, or disposal of a hazardous waste that contaminated the facility; and (3) the hazardous waste may present an imminent and substantial endangerment to health or the environment.[54]  If Clean Harbors prevails on this claim, injunctive relief is the exclusive remedy under RCRA.

**1.    Whether CBS Was an Operator of the Facility and Contributed to Contamination at the Facility**

The first two essential elements of Clean Harbors's RCRA claim—whether CBS was an operator of the facility and whether CBS contributed to contamination at the facility—overlap.  Both elements turn on CBS's involvement in the facility's operations.

The parties agree that the Supreme Court's decision in *United States v. Bestfoods*[55] governs whether CBS, as a parent company, can be held directly liable as an operator of a facility owned by a subsidiary.[56]  It held: "any person who operates a polluting facility is

_____

[54]42 U.S.C. § 6972(a)(1)(B); *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007); *see also* doc. 90 at 24.

[55]524 U.S. 51 (1998).

[56]*See* doc. 97 at 53-58; doc. 104 at 55-60.  *Bestfoods* was a case brought under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA").  But the relevant provisions of RCRA and CERCLA are substantially similar and thus *Bestfoods* offers persuasive guidance with respect to interpreting RCRA.  *See United States v. Power Eng'g Co.*, 125 F. Supp. 2d 1050, 1070-71

directly liable for the costs of cleaning up the pollution.  This is so regardless of whether that person is the facility's owner [or] the owner's parent corporation . . . ."[57]  An "operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[58]  This includes "the exercise of direction over the facility's activities."[59]  A "parental officer's oversight of a subsidiary," however, must be distinguished from "such an officer's control over the operation of the subsidiary's facility."[60]

> Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.  The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.[61]

The second element of Clean Harbors's RCRA claim—that CBS contributed to the handling, storage, treatment, transportation, or disposal of a hazardous waste that

_____

(D. Colo. 2000).

[57]524 U.S. at 65.

[58]*Id.* at 66-67.

[59]*Id.* at 71.

[60]*Id.* at 72.

[61]*Id.* (quoting Lynda J. Oswald, *Bifurcation of the Owner and Operator Analysis Under CERCLA: Finding Order in the Chaos of Pervasive Control*, 72 Wash. U.L.Q. 223, 282 (1994)) (internal citation and quotation marks omitted).

contaminated the facility—requires a similar factual showing.[62]   A defendant's active

participation in weekly management meetings at which environmental compliance issues

were addressed has been held sufficient to confer operator status where the evidence showed

that no decisions were made at those meetings without the defendant's approval.[63]   Here,

Clean Harbors relies on the following ten facts:

> (1)   Westinghouse audited the facility in 1990 and 1992 to ensure the facility followed Westinghouse policies and procedures.  If the facility did not comply with Westinghouse policies and procedures, it required the facility to follow an action plan to correct noncompliance.

> (2)   Westinghouse placed its own employees in important management positions at the facility.

> (3)   Westinghouse received and commented on work plans and monthly reports summarizing the facility's activity.

> (4)   On at least one occasion, Westinghouse and Aptus shared in-house legal counsel.  Westinghouse attorneys negotiated a settlement between Aptus and the EPA, and corresponded with public and private entities on Aptus's behalf.

> (5)   Aptus had a limit-of-authority policy requiring Westinghouse approval for significant operational expenses.

> (6)   Westinghouse had to approve environmental remediation subcontractors before Aptus could use them.  Westinghouse employees

---

[62]*See Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) (contribution to disposal of hazardous waste requires a measure of control over the waste at time of disposal or active involvement in waste disposal process); *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) (noting RCRA requires active involvement in handling or storing of hazardous materials for liability).

[63]*City of Wichita, Kan. v. Trs. of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1054 (D. Kan. 2003) (applying *Bestfoods*).

reviewed the subcontractors' scope of work and estimated costs to determine whether the work was reasonable and necessary.

(7)     Westinghouse paid for the facility's hazardous waste disposal expenses, including a fine issued against the facility in 1994, and remediation services.

(8)     Westinghouse affirmatively sought 100% control of Aptus to obtain "full participation in Aptus management," "integration of Aptus into the overall Westinghouse strategy," and to "consolidate the sales and operating profit and obtain the advantages of Aptus' growth."

(9)     Once Westinghouse was in control, on at least one occasion its manager of permitting and compliance attended meetings at the facility between 1988 and 1995 to "fly the Westinghouse flag."

(10)    Westinghouse affirmatively told the Coffeyville community that "We know the facility's going to be run right because we have a say in it."[64]

CBS argues it is entitled to summary judgment because Clean Harbors has not shown that CBS caused the contamination in question. RCRA, however, is not so demanding. Rather, it contemplates operator liability if Clean Harbors merely can show CBS managed, directed, or conducted operations "having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[65] The facts listed above, taken together, create a genuine issue of material fact with respect to whether CBS played such a role.

CBS more specifically argues (1) through (4) do not give rise to an inference it operated the facility. But it does not specifically address (5) through (10). Even if CBS is

---

[64]Doc. 97 at 55-58.

[65]*Bestfoods*, 524 U.S. at 66-67.

correct, and (1) through (4) do not permit an inference that CBS operated the facility, when viewed in the light most favorable to Clean Harbors, (5) through (10) do.  Therefore, a genuine issue of material fact exists as to whether CBS operated the facility and contributed to the handling, storage, treatment, transportation, or disposal of a hazardous waste that contaminated the facility.[66]

### 2.    Whether the Hazardous Waste May Present an Imminent and Substantial Endangerment to Health or Environment

In *Burlington Northern & Santa Fe Ry. Co. v. Grant*, the Tenth Circuit explained what RCRA means by hazardous waste that "may present an imminent and substantial endangerment to health or the environment."[67]  The endangerment, i.e., threatened or potential harm, "must be ongoing, but the conduct that created the endangerment need not be."[68]  Thus Clean Harbors need not show "actual harm will occur immediately as long as the risk of threatened harm is present."[69]  Endangerment is substantial where there is "reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not

---

[66]CBS assumes, for purposes of this part of their motion, that leaks and spills during the time it owned NEI and Aptus contaminated the facility.  Doc. 88 at 19 n.3.

[67]505 F.3d at 1020-21; 42 U.S.C. § 6972(a)(2)(B).

[68]*Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1020 (quoting *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 292-93 (5th Cir. 2001)) (internal quotation marks omitted).

[69]*Id.* at 1020-21 (citing *Mehrig v. KFC W., Inc.*, 516 U.S. 479, 458-86 (1996)).

taken."[70]  Given "RCRA's language and purpose, 'if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment.'"[71]

CBS argues it is entitled to summary judgment because (1) Clean Harbors's designated representative testified he was unaware of any RCRA triggers; (2) Clean Harbors has not disclosed any expert testimony regarding imminent and substantial endangerment; and (3) Clean Harbors would be in violation of its RCRA permit if such a condition existed. Clean Harbors counters: (1) the EPA has stated the contamination presented a substantial threat; (2) onsite and offsite contamination levels exceed government cleanup standards; (3) contamination appears to be migrating offsite; and (4) monitored natural attenuation apparently is not working as anticipated and contamination remains higher than expected.

Some of the facts on which Clean Harbors relies date back to before any remedial measures were taken at the facility.  Such facts are of little relevance in determining any imminent and substantial endangerment to health or the environment.  But viewing the facts in the light most favorable to Clean Harbors, and drawing all reasonable inferences in its favor, a genuine issue of material fact exists as to whether the hazardous waste at the facility may present an imminent and substantial endangerment to health or the environment. Specifically, the parties genuinely dispute whether the contamination is circumventing the

---

[70]*Id.* at 1021.

[71]*Id.* at 1021 (quoting *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005)) (internal quotation marks omitted).

funnel and gate system and, if so, whether it may pose an imminent and substantial risk to human health and the environment.

### 3. Whether Injunctive Relief is Appropriate

CBS argues the injunctive relief RCRA provides is not available to Clean Harbors because the EPA has already implemented a comprehensive remedy for cleaning up the facility.[72]   Clean Harbors counters that the court may require CBS to continue the remediation it performed for years and to supplement Clean Harbors's remediation efforts as necessary to achieve target cleanup levels.  According to Clean Harbors, it does not ask the court to "establish a remedial plan that would duplicate efforts already undertaken by CBS and state or federal environmental agencies."[73]  Instead, it asks the court to order CBS, as a former owner/operator, to "fulfill its remediation obligations and to work with the EPA to establish what additional obligations must be undertaken" to address the contamination at the facility.[74]

RCRA gives the court broad equitable power to "enforce" a "permit, standard, regulation, condition, requirement, prohibition, or order," to "restrain any person who has

---

[72]Doc. 88 at 24.  In addition to the authority in CBS's memorandum in support of its motion for summary judgment (doc. 88) and its reply (doc. 104), CBS filed supplemental authority (doc. 107) in support of its contention that injunctive relief is inappropriate in this case.  Clean Harbors's motion for leave to file response (doc. 108) is granted.  In ruling, the court has considered the supplemental authority (doc. 107), Clean Harbors's response (doc. 108), and CBS's reply (doc. 109).

[73]Doc. 97 at 67.

[74]*Id.*

contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," and to "order such person to take such other action as may be necessary."[75]  To get injunctive relief, however, Clean Harbors has to "identify some action that defendant could be ordered to take that is not already in place" thanks to the EPA RCRA permit,[76] with which Clean Harbors is responsible for complying.  "Whether this is viewed as a lack of standing because the harm will not be redressed by this Court, or as a failure to demonstrate entitlement to relief under RCRA, the problem is the same: there is no basis for the relief plaintiffs seek because the contamination is already being addressed . . . ."[77]

Clean Harbors seeks an injunction requiring CBS to continue its investigation and complete remediation obligations at the facility.[78]  It makes two arguments in support of this request for injunctive relief.  First, Clean Harbors argues this case is different than those CBS

---

[75]42 U.S.C. § 6972(a).

[76]*87th St. Owner's Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1219-20 (S.D.N.Y. 2002).

[77]*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, No. 08-1709, 2012 WL 1134039, at *8-9 (W.D. Pa. 2012) (granting defendant summary judgment because plaintiff was already obligated to "remediate all environmental contamination" at the site); *SPPI-Somersville, Inc. v. TRC Cos.*, 2009 WL 2612227, at *15 (N.D. Cal. Aug. 21, 2009) ("There is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume to control or to predict.'") (internal citation omitted) (citing *Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006); *87th St. Owners*, 251 F. Supp. 2d at 1220-21 (granting defendant summary judgment where the state environmental agency had implemented a system for remediating contamination).

[78]Doc. 90 at 40.

cites because Clean Harbors seeks "an injunction to require a previous landowner to proceed with the remediation responsibilities it had been performing for years"[79]—as opposed to an injunction that would require a current landowner to clean up contamination it was already under an obligation to remediate.  But Clean Harbors offers no authority or reasoned basis for distinguishing between requiring a previous landowner to resume remediation that would overlap with ongoing EPA remediation efforts under a RCRA permit, and requiring a current landowner to undertake remediation that would duplicate ongoing state agency cleanup efforts.

Second, Clean Harbors argues the injunctive relief it seeks goes "beyond current activities as necessary to achieve the target cleanup levels" because the current corrective measures are not working.[80]  To this end, Clean Harbors argues the court could require CBS to "work with the EPA to establish what additional obligations must be undertaken to address the contamination at the Facility."[81]  In support, Clean Harbors cites cases in which the relief sought addressed one issue (e.g., soil contamination) and an agency cleanup order addressed another (e.g., groundwater contamination).[82]  Problematically, however, Clean Harbors fails

---

[79]Doc. 97 at 66.

[80]*Id.*

[81]Doc. 97 at 69.

[82]*Organic Chems. Site PRP Grp. v. Total Petroleum, Inc.*, 6 F. Supp. 2d 660, 665 (W.D. Mich. 1998) (denying motion to dismiss RCRA citizen suit for cleanup of soil contamination where plaintiff alleged EPA had taken action only with respect to groundwater contamination); *A-C Reorg. Trust v. E.I. DuPont de Nemours & Co.*, 968 F. Supp. 423, 430-31 (E.D. Wis. 1997) (adding RCRA claim regarding groundwater contamination not futile

to specify what "additional obligations" it has in mind.

> Of course, the details of remedial orders may often be fleshed out as a result
> of a full trial, and plaintiffs are not required to present in advance of trial a
> detailed draft of the injunction that they expect a court to enter at the end of the
> case. But given the limited jurisdiction conferred by RCRA, which extends
> only to ordering such actions as are necessary to correct a potential "imminent
> and substantial endangerment to health or the environment," a plaintiff cannot
> require the Court to conduct a full trial in the hope that some idea might then
> turn up as to what relief could be available.[83]

Moreover, the RCRA permit that obligates Clean Harbors to clean up the facility is

quite comprehensive. It requires Clean Harbors to implement the final corrective measures

the EPA identified, any additional corrective measures the EPA may identify, any interim

measures necessary to protect human health and the environment, and requires Clean Harbors

to maintain financial assurances to ensure its cleanup obligations are met even if it becomes

unable to pay for the remediation. Clean Harbors does not specify how the relief it seeks as

against CBS would differ from or supplement Clean Harbors's own obligations under the

RCRA permit. Nor does Clean Harbors explain, in light of the comprehensive nature of the

permit, why an order requiring CBS to cleanup the facility is necessary to protect human

health or the environment. Thus it appears any "additional obligations" would fall squarely

within the scope of the EPA RCRA permit.

---

where EPA consent order only expressly covered surface contamination and might not
extend to groundwater); *Muniz v. Rexnord Corp.*, No. 04 C 2405, 2004 WL 2011393, at *3
(N.D. Ill. Sept. 3, 2004) (finding consent order regarding groundwater contamination did not
bar RCRA citizen suit regarding related airborne contamination).

[83]*87th St. Owners*, 251 F. Supp. 2d at 1220.

As in other purported RCRA cases, it seems this case is about the cost of cleaning up the facility, as opposed to preventing endangerment to human health or the environment.[84] Clean Harbors seeks injunctive relief requiring CBS to clean up the very same contamination Clean Harbors is required to remediate under the RCRA permit.  In other words, the RCRA permit already provides the relief that would be available to Clean Harbors under RCRA, albeit by requiring Clean Harbors (as opposed to CBS) to conduct the cleanup.  Issuing a RCRA injunction to remediate a site that already must be, and is being, remediated "would serve no purpose."[85] Therefore CBS is entitled to summary judgment on Clean Harbors's RCRA claim.[86]

### E.      Clean Harbors's Remaining Claims

Clean Harbors has seven remaining claims, all based on state law: declaratory

---

[84]*Trinity Indus.*, 2012 WL 1134039, at *9 ("This case is . . . about apportioning financial responsibility for remediation efforts, not enjoining and remediating an environmental danger."); *87th St. Owners Corp.*, 251 F. Supp. 2d at 1221 (finding relief plaintiff really sought was "not about improving or eliminating any hazard that might continue to exist at the site, but about determining responsibility, both financial and operational, for the measures, already in place, that appear to be accomplishing all that can be accomplished toward that goal.").

[85]*Trinity Indus.*, 2012 WL 1134039, at *9; *see also SPPI-Somersville, Inc.*, 2009 WL 2612227, at *15 (N.D. Cal. Aug. 21, 2009); *87th St. Owners*, 251 F. Supp. 2d at 1220.

[86]Although the court struck Clean Harbors's DeJong affidavit, CBS would be entitled to summary judgment even if the affidavit were considered.  The court has reviewed the affidavit.  It primarily pertains to the management of the facility and does not at all bear on the appropriateness of RCRA injunctive relief.

judgment (count II),[87] negligence (count III), trespass (count IV), nuisance (count V), strict

liability (count VI), unjust enrichment (count VII), and indemnification (count VIII).

Significantly, the pretrial order alleges only two bases for subject matter jurisdiction: federal

question under 28 U.S.C. § 1331 and supplemental under 28 U.S.C. § 1367. Having granted

CBS summary judgment on Clean Harbors's RCRA claims, the court no longer has

independent federal question jurisdiction. Under 28 U.S.C. § 1367(c), the court has

discretion to decline to exercise jurisdiction over a state-law claim if it "raises a novel or

complex issue of State law" or the court "has dismissed all claims over which it has original

jurisdiction."[88]

    In the usual case in which all federal-law claims are eliminated before trial, the

balance of factors the court considers in determining whether to exercise

jurisdiction—judicial economy, convenience, fairness, and comity—will point toward

---

[87]The Declaratory Judgment Act, 28 U.S.C. § 2201, is not a jurisdictional statute. *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 512 (10th Cir.1994). It is "procedural only," *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937), and "does not itself confer jurisdiction on a federal court where none otherwise exists," *Henry*, 43 F.3d at 512. Therefore Clean Harbors must assert "a case of actual controversy" within the court's jurisdiction. Clean Harbors argues it is entitled to declaratory judgment because it is entitled to relief under one or more of its legal theories. Thus it appears this claim is redundant. At the very least, because the court has granted summary judgment to CBS on Clean Harbors's RCRA claim, the basis for declaratory judgment is now limited to state-law claims.

[88]28 U.S.C. § 1367(c)(1), (3); *see also Medina v. City of Osawatomie*, 992 F. Supp. 1269, 1279 (D. Kan.1998) (whether to exercise supplemental jurisdiction is within the district court's sound discretion).

declining to exercise jurisdiction over the remaining state-law claims.[89]  The court finds no compelling reason to exercise supplemental jurisdiction to decide the merits of Clean Harbors's state-law claims.[90]  Moreover, Clean Harbors's state-law claims involve complex issues including the scope of tort duties and continuing tortious conduct.  In the interest of comity and federalism, Clean Harbors's remaining claims are dismissed, without prejudice to those claims being filed in state court.

This federal court will not presume to dictate or control any state-court proceedings that may follow.  But it should be noted that the parties already have conducted (and reportedly completed) very extensive discovery.  The parties have agreed on a pretrial order and they have filed and fully briefed dispositive motions.  These efforts need not be duplicated.  Any follow-up state-court case therefore should be in a position to proceed to trial in the next few months.

### III.  Order

In consideration of the foregoing, it is hereby ordered:

1.     CBS's motion to strike rebuttal expert reports **(doc. 73)** is denied as moot.

2.     CBS's motion to strike **(doc. 98)** is granted.

3.     CBS's motion for summary judgment **(doc. 87)** is granted.

---

[89]*McWilliams v. Jefferson Cnty.*, 463 F.3d 1113, 1118 (10th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

[90]*See Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) (notions of comity and federalism demand that state court try its own lawsuits, absent compelling reasons to the contrary).

4.     Clean Harbors's motion for leave to respond to CBS's submission of supplemental authority (**doc. 108**) is granted.

5.     CBS's motion for leave to file supplemental submissions (**doc. 110**) is denied as moot.

6.     This case is dismissed.

Dated June 26, 2012, at Kansas City, Kansas.


                              s/ James P. O'Hara
                              James P. O'Hara
                              U.S. Magistrate Judge